## CENTRAL OF GEORGIA R. CO. v. RAILROAD COMMISSION OF ALABAMA.

### WESTERN RY. OF ALABAMA v. SAME.

#### (District Court, M. D. Alabama. December 4, 1913.)

1. CONSTITUTIONAL LAW (§ 298*)—DUE PROCESS—PASSENGER RATES—DETERMINATION BY RAILROAD COMMISSION—RIGHT TO HEARING.

   Railroad companies were not deprived of due process of law because they were not accorded a hearing before the State Railroad Commission when it passed a preliminary order ex parte fixing an intrastate passenger rate.

   [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.*]

2. CONSTITUTIONAL LAW (§ 298*) — DUE PROCESS — RATES — REGULATION BY COMMISSION—BIAS.

   A preliminary order of the State Railroad Commission, reciting its belief that intrastate passenger rates were unreasonably high, did not indicate that the commission had prejudged the case before hearing it, since such "belief" only implied that the commission entertained what they considered reasonable grounds for investigation and did not warrant a final

order which could only be based on sworn evidence subsequently introduced.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.*]

3. JUDGMENT (§ 715*)—DETERMINATION—CONCLUSIVENESS—RES JUDICATA.

A final decree, in a proceeding to restrain the enforcement of statutory carriage rates, holding that the statutory system in its entirety resulted in confiscation, was not res judicata of a contention subsequently made that the statutory passenger rate when put in operation with no other part of the statutory system, but with restored voluntary and higher freight rates, and under changed traffic conditions, would be confiscatory.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1244–1246; Dec. Dig. § 715.*]

4. CARRIERS (§ 18*)—REGULATIONS—PASSENGER RATES—CONFISCATION—ELEMENTS.

In order to show confiscation by a statutory intrastate passenger rate, the carrier must establish that the intrastate business under its freight rates in connection with the passenger rate objected to will not yield a fair return on the fair value of all its property devoted to intrastate business in the state, and that the passenger rate substantially contributed to such result.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

5. CARRIERS (§ 12*)—RATES—REGULATION—VALUATION OF PROPERTY.

The valuation of a carrier's intrastate property for the purpose of determining the reasonableness of rates on intrastate business may be obtained by taking the values fixed by the state for taxation purposes and raising them to 100 per cent.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

6. CARRIERS (§ 12*)—INTRASTATE RATES—REASONABLENESS—DETERMINATION—APPORTIONMENT OF VALUES.

In determining the reasonableness of intrastate rates, values cannot be apportioned as between interstate and intrastate business, and freight and passenger business on a gross revenue basis, nor can a carrier be permitted to charge for more costly equipment, roadbed, track, and structures constituting a part of an interstate route than would be justified for the conduct of intrastate business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

7. CARRIERS (§ 12*)—RATES—VALUES OF ROAD AND EQUIPMENT—MAINTENANCE—APPORTIONMENT—INTRASTATE AND INTERSTATE BUSINESS.

Where railroads in a state constituted links in through routes built with the purpose and having its chief value to its owners in interstate traffic, the intrastate business being incidental only, the latter business should not be burdened, in determining the reasonableness of intrastate rates, by the same proportion of value, or of expense of equipment, as the interstate business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

8. CARRIERS (§ 12*)—RATES—REGULATION—INTRASTATE BUSINESS—CONFISCATION.

While the test of confiscation in the fixing of intrastate passenger rates is whether the carrier's entire intrastate business is unremunerative, yet the carrier has no absolute right to a passenger rate that will in every case be sufficient to raise its total intrastate revenue to the remunerative point;

*For other cases see same topic.& § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the carrier being only entitled to demand that its entire intrastate revenue be not brought below the remunerative point by an unreasonably low passenger rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

9. CARRIERS (§ 12*)—RATES—REASONABLENESS.

Where a reduced passenger rate in a typical year, on experiment, yields a revenue equal to that produced by a former higher rate in a year of exceptional prosperity, and voluntarily used by the carrier for many years, the reduced rate cannot be held unreasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

10. CARRIERS (§ 12*)—RATES—REASONABLENESS.

Where a carrier voluntarily maintained a 3-cent passenger rate for years, and, after the rate had been reduced to 2½ cents by order of the State Railroad Commission, it was found that the latter rate produced equal or greater revenue to the carrier, it was estopped to claim, in support of a contention that the 2½-cent rate was confiscatory, that the 3-cent rate did not yield sufficient revenue to make the carrier's entire intrastate business remunerative, and this whether the equal or increased revenue under the lower rate was due to stimulation of business caused by the carrier, or to increased density of traffic owing to development of the country served by it.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

11. CARRIERS (§ 12*)—RATES—ESTABLISHMENT—REASONABLENESS.

Increased revenue under a lower freight rate, owing to development of the territory served, should be divided between the carrier and the public, while the latter should have the entire benefit of increased revenue due to increased traffic from the lowering of the rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

12. CARRIERS (§ 18*)—RATES—DETERMINATION BY COMMISSION—REVIEW.

In a suit to restrain carriers' rates fixed by the State Railroad Commission on intrastate commerce, the court can only determine whether the rates fixed are confiscatory, and may not review the commission's determination of questions of business policy.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

In Equity. Suit by the Central of Georgia Railroad Company and by the Western Railway of Alabama against the Railroad Commission of Alabama to restrain the enforcement of a 2½-cent passenger rate for intrastate traffic. Application for temporary injunction. Denied.

See, also, 197 Fed. 954.

R. E. Steiner, of Montgomery, Ala., and T. M. Cunningham, Jr., of Savannah, Ga., for plaintiff Central of Georgia R. Co.

R. E. Steiner, of Montgomery, Ala., for plaintiff Western Ry. of Alabama.

S. D. Weakley, of Birmingham, Ala., and R. C. Brickell, Atty. Gen., of Alabama, for defendants, Charles Henderson, Leon McCord, and Frank N. Julian, composing the Railroad Commission of Alabama.

Before SHELBY, Circuit Judge, and SHEPPARD and GRUBB, District Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

GRUBB, District Judge. These cases were submitted together upon motions for injunctions pendente lite against the enforcement of orders of the Railroad Commission of Alabama, fixing a 2½-cent rate for intrastate passenger traffic on the railroads of the two defendants. Some of the contested questions are the same in each case; all are similar; and the conclusions in each case can well be expressed together.

## Due Process.

[1] It is claimed that plaintiffs were deprived of due process of law because the preliminary order of the commission, which determined that the investigation, upon which the order complained of was made, should be held, was made ex parte, and that it showed that the commission had prejudged the case. We think it clear the plaintiffs were not entitled to a hearing before the commission when it passed the preliminary order any more than a defendant would be entitled to a hearing before a grand jury. The function of each is to determine whether there should be a hearing, and it is only at that hearing, if ordered, that the plaintiffs are entitled to be present.

[2] It is contended that the order reciting the belief of the commission that the rate was unreasonably high shows that the commission had prejudged the case, before hearing it. The commission might well believe a rate was unreasonable without prejudging the case. Belief would not justify a final order. Such an order could be based only on a finding by the commission, based on sworn evidence. "Believing" amounts to little more than "having reason to believe," and only implies that the commission entertained what they considered reasonable grounds for entering upon an investigation. Plaintiff the Central of Georgia Railroad Company claims it was deprived of due process because it was not given an opportunity to argue the case after the evidence was closed. From the record, it would seem that the commission was authorized to infer that the plaintiff had waived its right to argue the case, before it acted on the case. The plaintiffs also claim that there was an absence of evidence before the commission to justify the order. The commission were authorized to act as well on the plaintiffs' evidence as on that introduced by the state, if from it inferences could be reasonably drawn to support its conclusions. The effect of the evidence would be different, depending upon the way in which such inferences were drawn by the commission. The adoption of certain methods of deduction would lead to the commission's conclusion and of certain others to that contended for by plaintiffs. The commission had jurisdiction to draw the inference, and it is not shown that it acted on anything but the evidence submitted to it in arriving at its conclusion.

## Res Adjudicata.

[3] The final decree of the District Court on the first supplemental bill held that the statutory system of rates, in its entirety—one act taken in connection with all the others—resulted in confiscation. It did not hold that the passenger rate, when put in operation with no other part of the statutory system, but, on the contrary, with the restored voluntary and higher freight rates, and in connection with such

changed traffic conditions, as appear from traffic statistics for the years since the final decree, would produce confiscation. The issues presented by the first and second supplemental bills are therefore not the same. The reasons given in the opinion of the court in the Louisville & Nashville Railroad Company case apply to this case.

## Confiscation.

[4] The plaintiffs, to show confiscation, must establish: (a) That the intrastate business under the restored voluntary freight rates, in connection with the statutory passenger rate of 2½ cents, would not yield a fair return on the fair value of all property devoted to intrastate business in Alabama; and (b) that the 2½-cent statutory passenger rate substantially contributed to such result, if shown.

[5] (a) The values of plaintiffs' properties in Alabama, based on the values fixed by the state for taxation purposes, raised to 100 per cent., seem fair bases.

[6] The apportionment of values as between inter and intra and freight and passenger business, on the gross revenue basis, is subject to the criticism of the Supreme Court in the Minnesota rate case, as is the same method of apportionment when applied to expenses, as between inter and intra and freight and passenger business. The plaintiffs contend that the court can ignore such erroneous methods of apportionment, because confiscation so clearly appears that the erroneous methods of apportionment may be safely disregarded, as was done by the Supreme Court in the St. Louis & Minneapolis Railroad Company case. The claim in this respect is that neither road earned more than 2½ per cent. on its total business in Alabama on the fair value of the property devoted to that business. In answer, the defendants contend that the plaintiffs' division of operating expenses between other states and Alabama is incorrect, and deny that the valuation of the property attributed to Alabama business is justly attributed to it. It is contended, especially with reference to the Western Railway, that the equipment, roadbed, track, and structures are much more costly than would be justified for the Alabama business conducted over and by means of them, and it seems to us that this is true as to both roads to some extent, and that it would not be fair to charge Alabama business with its proportion of the valuation of a road which was much more expensively built and equipped than was appropriate for the character of the business done over it within that state.

[7] Each of the two roads in Alabama seems to be a link in a through route, built with the purpose and having its chief value to its owners in that use; the intra or local business being incidental only. If this is true, it seems to us that the intra business should not be burdened by the same proportion of value or of expense of maintenance of road and equipment as the interstate business. If the owners get the benefit of the principal or interstate use, which makes higher class construction essential, they cannot expect to get the same measure of return on intrastate business, which requires for its conduct no such expensive roadbed or equipment. However, it seems to be unnecessary to determine whether plaintiffs employed correct methods to ap-

portion value and expense, or whether such methods, if erroneous, were not such as to change the result, because, conceding that the entire intrastate business is shown to be unremunerative, it does not clearly appear that the reduced passenger rate contributes to this result.

(b) It is not enough to show that more revenue would be yielded to plaintiffs from a 3-cent fare. It must further appear that the 2½-cent rate was unreasonably low, otherwise the reduction in revenue from the reduced rate would not be a subject of complaint by the carrier.

[8] It is true that the test of confiscation is that the carrier's entire intrastate business is unremunerative. Yet it does not follow that the carrier has the absolute right to a passenger rate that will, in every case, be sufficient to raise its total intra revenue to the remunerative point. If it had such right, the passenger would frequently carry the burden of the freight to an undue and prohibitive extent. The freight revenue of a carrier is usually many times greater than its passenger revenue, and it is easy to see what result on passenger rates would follow the application of such a principle. All that the carrier can demand is that its entire intra revenue is not brought below the remunerative point by an unreasonably low passenger rate.

[9] Can it be said that a reduced rate which yields in a typical year, on experiment, a revenue equal to that produced by a former higher rate, in a year of exceptional prosperity, and voluntarily used by the carrier for many years, is unreasonably low?

[10] It may be said that the former voluntary rate did not yield enough revenue to raise the carrier's entire intra business to the remunerative point; but, having voluntarily maintained such a rate for years, can it be heard to say that the old rate is unreasonably low, and, if not, is it not equally true that it will not be heard to say that a lower rate, but one which produces an equal or greater revenue to the carrier, is too low? And is this not true whether the equal or increased revenue under the lower rate is due to stimulation of business caused by it, or to increased density of traffic due to development of the country served by it? It is clear that the carrier is not injured by the reduction, if the reduced rate so stimulates travel as to equal or increase the revenue obtained under the old rate.

[11] It seems that, if the increased revenue under the lower rate is due to the development of the territory served, the carrier and the public served by it should each share in the benefit. The pioneer carrier frequently operates its road through a sparsely settled territory at a loss, and for that reason should share in the advantages due to the subsequent higher development of the country. On the other hand, the community served should also profit by the increased population. It is universally true that passenger rates are lowered as traffic increases in density. The benefit of the increment due to stimulation of the lower rate should go entirely to the public, and that due to the growth of the tributary territory should be divided between the carrier and its patrons. Can it then be said that a reduced passenger rate, which when put into operation produces a revenue equal to or greater

than a higher rate of the carrier's own selection and adoption, is a confiscatory rate?

[12] It might be better. policy for the commission to permit the carrier to reap the benefit of the country's growth and enable it thereby to give better and safer service, but this is a matter for the decision of the commission and not the courts, whose sole province is to preserve the carrier's property from confiscation, and not to review the commission's determination on questions of business or public policy. It seems to us that a passenger rate cannot be said to be confiscatory or unreasonably low when its effect, on experiment, is to yield the carrier as much or more revenue than was produced under its former higher rate.

It seems to us that the figures in the supplemental bill show that, in each case, the 2½-cent. rate, whether due to stimulation or increased density of traffic in the territory served by the two carriers respectively, has proved as great a revenue producer as the 3-cent rate which preceded it.

### Central of Georgia Railroad Company.

With reference to the Central (page 14, supplemental bill): Intrastate. passenger earnings were $500,311 for the most prosperous year of 1907 under the 3-cent rate. Owing to the panic of the fall of 1907, they declined for the years 1908 and 1909. The 2½-cent rate was in effect during the fiscal years 1910, 1911, and 1912. The intra passenger revenue increased progressively during the fiscal years 1910, 1911, and 1912. In 1911, under the 2½-cent rate, they exceeded those of 1907 by $25,000. In 1912 they exceeded those of the year 1907 by $55,000. In 1913 the 3-cent rate was in force. In that year the revenue from intra passenger business was $99,000 more than 1907. For the year 1913, if the total intra passenger business be reduced to the 2½-cent basis, it would still have yielded an amount equal to that of 1907 which was earned on a 3-cent fare. All the travel for 1913 was not on a 3-cent basis. A substantial part of it was on a 2½ or 2 cent basis. It is clear from this that if the 2½-cent fare had been in force during the fiscal year 1913, instead of the 3-cent fare, the revenue from 1913, on a 2½-cent basis, would have substantially exceeded that for 1907 on the 3-cent basis.

It is said that the year 1912 is not typical because one of unusual prosperity. This is true also of the year 1907 with which it is being compared. However, the year 1913 is conceded to be a year of only average prosperity because of a short cotton crop. Yet the plaintiff's figures of intrastate passenger returns for that year, reduced. to the 2½-cent basis, will show an increase over the earnings of the banner year of 1907. These figures are the plaintiff's own and are not arrived at by doubtful methods of apportionment.

It is said that the carriers have lean and prosperous years, and that the prosperous years must be looked to to help out the lean years, and this is clearly true. However, the year 1913 is stated by plaintiff's counsel to have been only a normal year, if even that. There is also shown to have been an unusual increase in plaintiff's passenger earnings for its system during each year, except for the panic years of 1908 and 1909, from 1900 to 1912, aggregating in that period the dif-

ference between $1,373,433 in 1900 and $3,777,488 in 1912, the former under the 3-cent fare and the latter under the 2½-cent fare (page 19, supplemental bill). This shows a continued general increase in passenger earnings through the whole period, with, however, smaller eras of depression during years of adversity. The history of the system fairly reflects the history of the Alabama portion of it in this respect. Again, for the last three years of the 3-cent fare (1907, 1908, and 1909) the earnings, as compared with the three first years of the 2½-cent fare (1910, 1911, and 1912), are shown by the bill to have averaged less annually by an amount of approximately $35,000. The supplemental bill (page 14) also shows that in 1912 the plaintiff carried approximately 39 per cent. more passengers in Alabama than it did in 1907; and that it carried more than 30 per cent. more intrastate passengers in Alabama in 1912 than it did in 1908. (No separation of inter and intra passengers is given in the bill for 1907.) These facts are persuasive that the plaintiff the Central of Georgia Railroad Company is now on a different basis as to passenger earning capacity in Alabama than it was in the years prior to and including 1907—so much so that a 2½-cent passenger fare, owing to stimulation of travel and increased density of traffic, will yield substantially more revenue now in a normal year than a 3-cent fare formerly yielded in a year of abnormal prosperity. This being so, we do not think confiscation can be predicated upon a rate producing such results.

### Western Railway of Alabama.

Applied to the Western Railway: On page 34 of the Western's supplemental bill is a table of passenger earnings for the years from 1907 to 1913, inclusive, including mail and express earnings. The earnings for intra business for 1907 are $207,175. For 1908 they are $206,264. From thence on to and including 1913, they progressively increase each succeeding year in substantial amounts. In 1913, under the 3-cent fare, they were $313,835. Reduced to the 2½-cent basis, assuming that all travel was on the 3-cent basis, their amount for 1913 would be $260,833, which is substantially less than the true amount, since some of the travel was on the basis of 2½ cents instead of 3 cents. Yet it exceeds the intra earnings for 1907 on the 3-cent basis by more than $50,000, an increase of 25 per cent. Between the years 1910 and 1913, as shown by the table on page 33 of the supplemental bill, there was a substantial increase of each year over the others in the number of passengers carried, and in the period a total increase of more than 103,000 passengers carried annually, an increase of 40 per cent. In passenger miles during the same period, there was an increase of 2,178,347, an increase of 28 per cent., and a greater increase for 1912 over 1910 than for 1913 over 1910. The revenue from intrastate passengers only during the same period increased in a substantial amount, even after reducing the revenue of 1913 to a 2½-cent basis in its entirety. This tends to show not only that the Western prospered during the period the 2½-cent rate was in force, but, when comparison is made with the year 1907, it is fair to assume that an era of improvement permanent in its character in the passenger traffic of the West-

ern has come, and that a 2½-cent rate, under it, produces substantially more revenue than did a 3-cent rate during the year 1907 and those preceding it. Whether this is attributed to stimulation of travel from the lower rate or the permanent settling up of the country and increased density of traffic, or both, it tends to show that the Western has reached a state where it can now endure a 2½-cent rate without confiscation, though formerly it may not have been able to have done so. It put in force and continued voluntarily for years a 3-cent rate, which yielded less revenue than the statutory 2½-cent rate yielded while in force, or would now yield, if restored. This is persuasive that the 2½-cent rate is not confiscatory in its operation, since the 3-cent rate, though producing less revenue when formerly in force, was not so considered by the carrier.

In both the Western and Central cases, the bill shows that the interstate passenger earnings during the period of the 2½-cent rate increased along with the intrastate over those of the year 1907. The increase in intra is therefore not shown to have been at the expense of the inter state passenger earnings. As we recall, the increase in the case of the Western was not accompanied by the putting on of any additional trains or added expense to accommodate the additional travel. In the case of the Central, one additional train, the Seminole Limited, was put on during the period of the 2½-cent rate, but it was clearly put on to accommodate interstate travel, since the record shows that it competed with the Central's trains numbered 3 and 4, between Birmingham and Macon, for Alabama local business, both passing from Columbus to Birmingham and the reverse, close together in point of time. It is clear the existing trains (3 and 4), therefore, sufficiently accommodated the local business.

The other additional operating expense claimed comes from the higher wages and prices for material and increasing taxes, which we know to exist. Neither the bill nor affidavits show the amount of this increase with certainty. It is true, adopting the methods of apportionment of the plaintiffs, the net earnings from intrastate passenger business in Alabama are shown to yield an inadequate return on the value of the property attributed to intrastate passenger business by plaintiffs' method of apportionment; plaintiffs' method of apportionment being faulty, the conclusion reached cannot be taken. If increased operating expenses, caused by the necessity of paying higher wages, higher prices for material and increased taxes, when properly apportioned to plaintiffs' intrastate business in Alabama, reduced a gross revenue from that business which would be otherwise adequate, so as to be unremunerative, a showing that the passenger rate of 2½ cents was confiscatory would be presented. Plaintiffs' conclusions as to net return from intrastate passenger business in Alabama are based on the gross revenue method of apportionment of the value of the property devoted to that business and its share of operating expenses. These methods are condemned by the Supreme Court, and the results arrived at by them cannot be accepted by us. The effect of increased wages, etc., are not so apparent on the question of confiscation as to make erroneous methods of apportionment of no consequence. The effect of such

increases does not otherwise appear in the record. In any proper apportionment of value, it seems also to us that the value of a road and equipment reasonably suitable for the conduct of an intrastate business should be the basis, rather than the value of a higher class road with like equipment reasonably adapted for interstate business alone, and too costly for intrastate traffic.

On the present showing we are not prepared to find that confiscation exists as a result of the 2½-cent passenger rate, as to either of the plaintiffs; and the motion for an injunction pendente lite, in each case, is denied.